UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ENRIQUE ESTRADA, | ) | |
| | ) | |
| Petitioner, | ) | 12 C 1016 |
| | ) | |
| vs. | ) | Judge Feinerman |
| | ) | |
| SOFIA SALAS-PEREZ, | ) | |
| | ) | |
| Respondent. | ) | |

**MEMORANDUM OPINION AND ORDER**

Petitioner Enrique Estrada and Respondent Sofia Salas-Perez are the parents of a seven year-old child. Estrada lives in Mexico and Salas-Perez lives in Illinois. Pursuant to a custody agreement signed by Estrada and Salas-Perez and entered by a Mexican family court in March 2010, the child resided with Estrada in Mexico during the school year and traveled to Illinois during school vacations to visit Salas-Perez. In August 2011, Salas-Perez refused to send the child back to Mexico at what was supposed to be the end of her summer vacation in Illinois. In September 2011, pursuant to the Hague Convention on the Civil Aspects of International Child Abduction, T.I.A.S. No. 11,670, 1343 U.N.T.S. 89 (Oct. 25, 1980), Estrada filed with the Mexican Central Authority a request for the child's return to Mexico. The Mexican Central Authority forwarded the request for return to the United States Central Authority.

On February 13, 2012, Estrada filed a counseled Hague Convention petition in this court. Doc. 1. Days later, the court issued a temporary restraining order enjoining Salas-Perez from removing the child from the Northern District of Illinois. Doc. 9. Salas-Perez appeared through counsel, moved to dismiss the petition, and filed an answer. Docs. 14-16. The parties agreed to

-1-

extend the temporary restraining order through the date of the evidentiary hearing, which ultimately was scheduled (with the parties' agreement) for September 18, 2012. Docs. 18, 27, 33-35. In the meantime, on the parties' joint motion, the court appointed Dr. Héctor Machabanski, Ph.D., a clinical psychologist, as an expert under Federal Rule of Evidence 706; the court directed Dr. Machabanski to examine the child and to submit a report regarding, among other things, whether the child was abused in Mexico and whether she would face a grave risk of harm if returned to Mexico. Doc. 29. The parties agreed at the pretrial conference (Doc. 36) that the court could consider Dr. Machabanski's report without having to call him to testify; they also agreed that neither party would call the child to testify.

This case presents two principal issues. The first is whether Estrada has proved by a preponderance of the evidence that Salas-Perez wrongfully retained the child in Illinois within the meaning of Article 3 of the Convention. *See Kijowska v. Haines*, 463 F.3d 583, 586 (7th Cir. 2006); *Koch v. Koch*, 450 F.3d 703, 715 (7th Cir. 2006). The second issue, which becomes relevant only if there was a wrongful retention, concerns Article 13(b) of the Convention, which provides that a wrongfully retained child should not be returned to her habitual residence if the retaining parent proves by clear and convincing evidence that "there is a grave risk that … her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Convention, art. 13(b); *see Khan v. Fatima*, 680 F.3d 781, 784 (7th Cir. 2012); *Altamiranda Vale v. Avila*, 538 F.3d 581, 587 (7th Cir. 2008); *Fabri v. Pritikin-Fabri*, 221 F. Supp. 2d 859, 863-64 (N.D. Ill. 2001).

Both sides presented testimony at the evidentiary hearing; Estrada called himself, while Salas-Perez called herself and Jennifer Lara, a licensed clinical professional counselor who examined the child in 2011. Both sides offered exhibits into evidence without objection.

Having considered the evidence and the parties' legal arguments, the court finds that (1) Estrada has proved by a preponderance of the evidence that Salas-Perez's retention of the child in Illinois was wrongful within the meaning of Article 3, and (2) Salas-Perez has not proved by clear and convincing evidence that the child's return to Mexico would place her at grave risk of harm within the meaning of Article 13(b). Accordingly, the court grants Estrada's petition and orders the child's return to Mexico.

## Findings of Fact

### A. The Parties

1.     Estrada was born in Mexico and moved to the United States in or around 1996. He is a Mexican national. Estrada moved from Illinois back to Mexico in May 2007.

2.     Salas-Perez was born in Mexico and moved to the United States in or around 2001 with her son Rigoberto. She is a Mexican national and currently resides in Illinois.

### B. Facts Pertaining to the Wrongful Retention Issue

3.     Estrada and Salas-Perez met in Mexico as children. When Salas-Perez first moved to Chicago, Estrada helped her get situated. They began a romantic relationship in or around 2003.

4.     On October 5, 2004, in Chicago, Salas-Perez gave birth to the child. Pet. Exh. 1.

5.     Estrada's and Salas-Perez's romantic relationship ended in or around May 2006.

6.     On July 17, 2006, Estrada filed in the Circuit Court of Cook County, Illinois, a petition to establish his paternity of the child. Pet. Exh. 2. On August 25, 2006, the Illinois court entered an agreed order awarding Estrada the "sole care, custody, control and education" of the child. Pet. Exh. 3. Salas-Perez was given weekend visitation rights and was required to pay child support. *Ibid*.

7.      After losing his job, Estrada decided in 2007 that he wanted to move back to Mexico with the child. Without obtaining Salas-Perez's consent or the Illinois court's permission, Estrada moved with the child to Mexico on May 27, 2007. Salas-Perez did not have advance notice of the move and did not learn that Estrada had left for Mexico with their child until days later.

8.      On July 17, 2007, on Salas-Perez's motion, the Illinois court entered an emergency order of protection requiring Estrada to return the child to Illinois, in compliance with the court's August 2006 custody order. Resp. Exhs. 3, 4.

9.      On July 26, 2007, Salas-Perez submitted a Hague Convention petition to the United States Department of State, claiming that Estrada's removal of the child to Mexico was wrongful because it violated her custody rights under the Illinois court's August 2006 and July 2007 orders. Resp. Exh. 5. Salas-Perez's petition eventually was registered as Case Number 1242/2007 in the Family Court of Cuautitlán Izcalli, Mexico. Pet. Exh. 9.

10.      In August 2007, Salas-Perez's son Rigoberto, who was seventeen or eighteen at the time, moved to Mexico to live with Estrada. Salas-Perez took Rigoberto to the airport knowing that he planned to live with Estrada. Rigoberto stayed with Estrada for less than one year. Salas-Perez lost contact with Estrada and the child after Rigoberto moved out of Estrada's home.

11.      Estrada enrolled the child in kindergarten and elementary school in Mexico.

12.      On May 16, 2009, Estrada married a woman named Janet, who moved in with Estrada and the child.

13.      Estrada did not learn of Salas-Perez's Hague Convention petition until June 2009, when he was served with process by a Mexican court officer.

14.     In January 2010, Salas-Perez, through her attorney at the Legal Assistance Foundation's Chicago office, filed a Motion for Modification of Parenting Agreement in the Illinois court. Pet. Exh. 7. The motion asked the state court to modify the August 2006 order to give Salas-Perez sole custody of the child. *Ibid*.

15.     In early 2010, Estrada and Salas-Perez spoke about negotiating a custody agreement; Salas-Perez credibly testified at the evidentiary hearing, without contradiction, that Estrada threatened that she would not be able to see the child unless she reached an agreement with him. An agreement was reached with the assistance of the parties' lawyers; Salas-Perez's lawyer (the one from the Legal Assistance Foundation) was not licensed to practice in Mexico. Salas-Perez's lawyer told her that it might be difficult for the Mexican authorities to bring Estrada into court, and that the fastest and surest way for her to see the child again would be to reach an agreement.

16.     In March 2010, the Office of the Secretary of Foreign Relations of Mexico wrote a letter to the Mexican family court reporting that the parties had reached an agreement regarding custody. The letter noted that Salas-Perez had submitted the custody agreement to the Secretary of Foreign Relations for the purpose of having it signed by Estrada and ratified by the Mexican court. Pet. Exh. 9. Salas-Perez signed the custody agreement at the Mexican Consulate in Chicago in front of Olga Georgina Velázquez, a consular official. Pet. Exh. 4.

17.     The custody agreement was entered on March 17, 2010, by the Mexican family court in Case No. 1242/2007. *Ibid*. The court order was signed by the Mexican judge, a representative of the Mexican Ministry of Foreign Affairs, Estrada, Estrada's attorney, and Silvia Torres Elizondo. *Ibid*. Elizondo signed on Salas-Perez's behalf, having previously been granted power of attorney. Pet. Exh. 12.

18.     The March 2010 custody agreement provides for shared custody.  It states that the child shall remain "under the care and attendance of her father [Estrada] in the domicile located in [Cuautitlán Izcalli, Mexico] in reason of considering both convenient and healthy for their minor daughter."  Pet. Exh. 4.  It further provides that the child shall attend school in Mexico under her father's "attention," that Salas-Perez shall have phone privileges while the child is in Mexico, and that the child shall visit Salas-Perez in Illinois during school breaks in December, Holy Week, and the summer.  *Ibid*.  The agreement also provides that the child shall return to Mexico from Illinois around the time school resumes after those breaks.  *Ibid*.

19.     At the evidentiary hearing, Salas-Perez testified to the existence of a March 2010 order entered by a Mexican court requiring Estrada to return the child to Chicago.  This court finds that no such order exists.  Salas-Perez did not have a copy of the supposed order; moreover, there would have been no need for the Mexican court to enter such an order in light of the parties' coming to terms on the custody agreement, which the court entered in March 2010.  Salas-Perez likely is confusing the July 2007 order entered by the Illinois court—which did order the child's return to Illinois—with the March 2010 order actually entered by the Mexican family court—which ratified the parties' custody agreement.

20.     On August 3, 2010, the Illinois court entered an order stating: "This matter comes before this Court on status, with counsel for the respondent, Sofia Salas, appearing and representing that the parties have entered into a settlement agreement which was entered in the court of Mexico, where the petitioner [Estrada] now resides.  As this settlement agreement addresses all issues before this Court and the respondent having moved this Court for leave to withdraw her Motion to Modify the Parenting Agreement, IT IS HEREBY ORDERED THAT

respondent is given leave to withdraw her Motion to Modify the Parenting Agreement." Pet. Exh. 8. The order was prepared by Salas-Perez's counsel from the Legal Assistance Foundation.

21.     Salas-Perez testified that she did not authorize the motion to withdraw the Motion to Modify the Parenting Agreement. The court does not find this testimony credible; Salas-Perez signed the March 2010 custody agreement, which provided for a custody arrangement markedly different from arrangement sought by her motion to modify, and her Chicago counsel is unlikely to have withdrawn the motion without first getting Salas-Perez's consent.

22.     In March 2010, July 2010, December 2010, and April 2011, consistent with the March 2010 custody agreement, the child visited Salas-Perez in Chicago for one- to three-week periods. At the end of each of these four visits, Salas-Perez sent the child back to Mexico, again consistent with the custody agreement.

23.     The child traveled to Chicago to visit Salas-Perez in May 2011 for summer vacation. Salas-Perez did not allow the child to return to Mexico in August 2011. Salas-Perez retained the child because the child said that she had been abused by Janet (Estrada's wife) in Mexico.

24.     When Salas-Perez called Estrada to tell him that she would not return the child to Mexico, Estrada tried to persuade her to do so.

25.     On September 30, 2011, Estrada filed a Hague Convention petition with the Mexican Central Authority seeking the child's return to Mexico. Pet. Exh. 5. The Mexican Central Authority forwarded the petition to the United States Central Authority on October 3, 2011. *Ibid.*; Pet. Exh. 10.

### C.    Facts Pertaining to the Grave Risk Issue

26.    In July 2011, Salas-Perez brought the child to see Jennifer Lara, a licensed clinical professional counselor who worked at a community agency in Chicago called Between Friends.  Resp. Exh. 9.  Lara met with the child several times in 2011.  Lara's written report of August 12, 2011, was admitted into evidence, Resp. Exh. 10, and Lara testified at the evidentiary hearing.  No objection was made to Lara's testimony under Federal Rule of Evidence 702.

27.    The court appointed Dr. Machabanski as an expert under Rule 706.  Doc. 29.  Dr. Machabanski met with the child five times from June 2012 to July 2012 and submitted a report to the court.  Pet. Exh. 16.  As noted above, the parties agreed that the court could consider the report without calling Dr. Machabanski as a witness at the evidentiary hearing.  No objection was made to Dr. Machabanski's report under Federal Rules of Evidence 702 or 802.

28.    It is undisputed that Janet required the child to eat food that had been put in a blender.  The court credits Lara's unrebutted testimony that the child understood this to be a form of punishment.  But the court also credits Estrada's unrebutted testimony that a doctor in Mexico recommended that the child's food be blended in those instances when the child was experiencing trouble swallowing.

29.    The child told Dr. Machabanski that Janet hit her on the arm two or three times, once with a wooden spoon, and that Estrada once hit her on the bottom with a shoe.  Pet. Exh. 16.  Lara's report notes that the child said that she had been hit on the arm with a wooden spoon, hit on the bottom (though by Janet, not by Estrada), and thrown onto the couch, but the report does not address the frequency of those physical episodes.  Resp. Exh. 10.  Lara's report also notes that the child said that she was forced to eat spicy food without being given water or tea.

30.     Dr. Machabanski concluded that "the episodes of hitting in Mexico were rare and unusual events, not recurrent or part of a pattern of violence." Pet. Exh. 16. Lara testified that she disagrees with this conclusion. The court resolves this discrepancy in Dr. Machabanski's favor. His report, which was prepared in early August 2012, expressly addresses the frequency of the hitting episodes; Lara's report, which was prepared in August 2011, does not. Lara acknowledged on cross-examination that she has a practice of including important details in her reports; if the child had told Lara of hitting episodes that were frequent rather than uncommon, Lara's report likely would have mentioned that fact. In addition, at the time she saw and evaluated the child, Lara did not have much experience in the counseling field in general or with young children in particular; in fact, the child was the first child seven years old or younger whom Lara had evaluated. (Dr. Machabanski's resume, which the parties submitted to the court in connection with their request that the court appoint him as a Rule 706 expert, indicates that he has over three decades of experience in the field.) Finally, Dr. Machabanski prepared his report shortly after his last session with the child, while Lara presented her testimony nearly a year after last evaluating the child. This means that the details of what the child said during the evaluation sessions—specifically, what the child said about the frequency of the hitting episodes—were much fresher in Dr. Machabanski's mind when he drafted his report than they were in Lara's mind when she testified at the hearing.

31.     Lara's report states that the child "did not want to return to Mexico with her father … and his family because they made her feel 'bad.'" Resp. Exh. 10. Lara opined at the hearing that returning the child to Mexico would place her at a grave risk of psychological harm in light of the hitting episodes and the child being required to eat blended food.

32.     Dr. Machabanski first broached the topic of the child's life in Mexico during his third session with the child.  On that topic, his report states: "[The child] talked about going to school in the morning, being picked up at school by her father, spending afternoons doing homework, fixing her room, playing with her brother Kevin [Estrada's son with Janet], watching television, and after dinner, playing with Kevin or finishing her homework.  [The child] said that Janet would help her with the homework and with her hair.  Both parents would help her with cleaning and bathing tasks."  Pet. Exh. 16.  The report adds: "[The child] spoke about having a good experience at school while living in Mexico with her father and spending weekends going to the market, playing with cousins, or eating out.  When asked about how she was treated in Mexico, her response was 'they treated me well.'  When asked about having any problems in Mexico, her answer was 'no.'  Later she said that Janet disciplined her, yelled, and hit her.  When asked about the hitting, [the child] showed a slight slap on the arm, adding that perhaps it was two or three times and that it was always in the arm and once it happened with a wooden spoon."  *Ibid*.  The report further states: "When asked about where she would like to live and with whom, [the child] said, 'I don't know' several times.  Later, she added that it was a difficult question and that she would like to live with both parents."  *Ibid*.

33.     Dr. Machabanski's report concludes: "While hitting children is not acceptable or an appropriate way of managing or disciplining them, in terms of what is generally defined as child abuse …, what [the child] seems to report about the incidents in Mexico do not seem to constitute significant or a serious pattern and do not seem to suggest that [the child] would be in any kind of grave risk if she were to return to Mexico.  It is possible that the attention given to this matter and/or the reaction of others to the reports of hitting/abuse and other issues in this case would make [the child] highlight or tune into these matters more than might be appropriate.

The hitting episodes seem rare and not severe, and [the child] seems to describe her overall life in Mexico as positive and desirable." *Ibid*.

34.     The court finds Dr. Machabanski's conclusions regarding the risks of returning the child to Mexico more persuasive than Lara's conclusions. Dr. Machabanski's report thoughtfully and rigorously connects the facts relayed by the child to the conclusions he reached. The parties jointly proposed Dr. Machabanski as a Rule 706 expert, which leaves no doubt as to his absolute neutrality and disinterest in the outcome of this case. Moreover, as noted above, Dr. Machabanski's report is very detailed; it is far more detailed than Lara's written report, and even has more detail than Lara's in-court testimony. As also noted above, at the time she saw the child, Lara had not had any experience evaluating children seven years old or younger. Moreover, the child's generally positive description to Dr. Machabanski of her life in Mexico casts doubt on Lara's conclusion that she would face a grave risk of psychological harm if returned there.

35.     Salas-Perez testified that the child said that Janet forced her to eat her own vomit. This court does not believe that the child said that or, more importantly, that she actually was forced to eat her own vomit. The child did not mention any such episode to either Lara or Dr. Machabanski. This omission is significant; the child told Lara and Dr. Machabanski about having to eat blended food and about the hitting episodes described above, and if she truly had been forced to eat her own vomit, that almost certainly is something she would have told them. Moreover, Salas-Perez did not reference the alleged vomit episode in any written submission to the court. The court will attribute Salas-Perez's testimony to confusion on her part; perhaps the child told Salas-Perez that the blended food tasted like vomit, and Salas-Perez somehow came to recall that the child had said that she was forced to eat vomit.

## Conclusions of Law

"The Hague Convention on the Civil Aspects of International Child Abduction … came into force between the United States and Mexico on October 1, 1991. Therefore, Hague Convention provisions for return would apply to children abducted or retained after October 1, 1991." U.S. Dep't of State, "International Parental Child Abduction: Mexico," http://travel.state.gov/abduction/country/country_508.html (last visited Sept. 23, 2012). The court has jurisdiction under the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. § 11601 *et seq*., which Congress enacted to implement the Convention. *See id*. § 1603(a). The ICARA provides that courts shall decide petitions brought under the ICARA "in accordance with the Convention." *Id*. § 11603(d).

### A. Wrongful Retention

Estrada has the burden of establishing, by the preponderance of the evidence, that the child was wrongfully retained in Illinois. *See* 42 U.S.C. § 11603(e)(1)(A). Article 3 of the Convention provides:

> The removal or the retention of a child is to be considered wrongful where—
>
> a)     it is in breach of rights of custody attributed to a person, an institution, or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and
>
> b)     at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.
>
> The rights of custody mentioned in sub-paragraph a) above, may arise in particular by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of that State.

Convention, art. 3. Article 5 provides that "'rights of custody' shall include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." Convention, art. 5(a). Analysis under Article 3 requires consideration of these factors: (1) when the retention occurred; (2) in what nation the child was "habitually resident immediately before" the time of retention; (3) whether "rights of custody [were] attributed to" the petitioner "under the law of the State" of habitual residence; (4) whether the retention was "in breach of" those rights; and (5) whether the petitioner was exercising those rights at the time of retention, or would have done so but for the retention. *See Fabri*, 221 F. Supp. 2d at 863 (articulating the third and fourth factors as a single inquiry).

As to the first factor, Salas-Perez retained the child in Illinois in August 2011 by failing to return her to Mexico for the start of the school year.

As to the second factor, the court finds that Mexico was the child's habitual residence immediately before the retention occurred. "The determination of 'habitual residence' is to be made on the basis of the everyday meaning of these words rather than the legal meaning that a particular jurisdiction attaches to them." *Kijowska*, 463 F.3d at 586. The Seventh Circuit has approved the standard set forth in *Mozes v. Mozes*, 239 F.3d 1067 (9th Cir. 2001), for determining habitual residence. *See Koch*, 450 F.3d at 715. "In the case of young children, the [*Mozes*] court found it most prudent to focus on the intent of the parents rather than the intent of the child in determining the child's habitual residence." *Id*. at 713. The standard requires courts "to determine whether the parents intended to abandon their previous habitual residence, judging that intent at the last time the parents had a shared intent." *Id*. at 709.

Ascertaining the child's habitual residence as of August 2011 is complicated by the fact that Estrada's May 2007 removal of the child from Illinois to Mexico almost certainly was

wrongful under Article 3, as it precluded Salas-Perez from exercising her rights under the Illinois court's August 2006 custody order. Estrada's unilateral and unauthorized move of the child to Mexico does not *in any respect* weigh in favor of finding the child's habitual residence to be Mexico. *See Kijowska*, 463 F.3d at 587 ("A parent cannot create a new habitual residence by the wrongful removal and sequestering of a child.") (internal quotation marks omitted). To the contrary, the child's habitual residence almost certainly was Illinois in the wake of, and in the years following, Estrada's move to Mexico with the child in May 2007.

The child's habitual residence changed from Illinois to Mexico in March 2010, when the Mexican family court entered an order ratifying the custody agreement reached by Estrada and Salas-Perez. The reason is plain: The March 2010 custody agreement explicitly manifested Estrada's and Salas-Perez's shared intent as of March 2010 that the child spend most of the year with Estrada in Mexico, where she would attend school, and that she stay with Salas-Perez in Chicago only during school vacations. *See Carrasco v. Carrillo-Castro*, 2012 WL 1948996, *9 (D.N.M. May 29, 2012) (holding that the child's habitual residence was Mexico where "the written agreement provided for [the child] to live with Flor in Mexico, and visit Daniel [in the United States] for one-month periods, every two months, for an indefinite length of time"); *Fabri*, 221 F. Supp. 2d at 869-70 (holding that the child's "annual month-long visits with her mother's family [in the United States] do not alter that conclusion" that the child's habitual residence was Italy, where she attended school). The agreement resolved the judicial proceeding that the Mexican court opened to adjudicate Salas-Perez's Hague Convention petition, which sought the child's return to Illinois; the agreement therefore manifests Salas-Perez's unequivocal understanding and intent that the child's principal residence be Mexico rather than Illinois. Salas-Perez's understanding and intent is further reflected by the August 2010 withdrawal of her

Motion to Modify the Parenting Agreement, which had asked the Illinois court to give her sole custody of the child. Salas-Perez's sending the child back to Mexico after four visits to Chicago between March 2010 and April 2011 provides further proof of her understanding and intent that the child's habitual residence was Mexico.

Salas-Perez contends that the March 2010 custody agreement does not reflect her true intent because it was signed out of fear that Estrada otherwise would have prevented her from seeing the child. The contention is not without force, and had it been made immediately after she signed the agreement, a close question would have been presented. But much water passed under the bridge between March 2010, when the agreement was entered by the Mexican family court, and the summer of 2011; during that time, Salas-Perez's actions plainly and unequivocally demonstrated that she shared an intent with Estrada that the child's habitual residence be Mexico. As just noted, Salas-Perez sent the child back to Mexico after *four* visits to Illinois between March 2010 and May 2011, reflecting her ratification and acceptance of the custody agreement even if it had been coerced at its inception. *See Norinder v. Fuentes*, 657 F.3d 526, 534 (7th Cir. 2011) ("Often parents will not agree about what their shared intentions were once litigation is underway, and so we must take account of the parents' actions as well as what they say."). The same holds for the August 2010 withdrawal of Salas-Perez's Motion to Modify the Parenting Agreement in the Illinois court. And Salas-Perez's explanation for her August 2011 retention of the child lies in tension with her argument that the custody agreement was coerced—Salas-Perez testified that she retained the child *not* because the custody agreement had been obtained through coercion, but because she believed that the child was being abused in Mexico. Put in the vernacular of the Hague Convention, Salas-Perez retained the child due to

her belief that the child faced a grave risk of harm if returned Mexico, not due to any belief that the child's habitual residence was Illinois because the custody agreement was invalid.

As to the third factor, the court holds that Estrada had rights of custody over the child under Mexican law at the time of the August 2011 retention. Article 3 focuses attention on the custody rights arising "under the law of the State in which the child was habitually resident immediately before the removal or retention," and recognizes that such rights "may arise in particular by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of that State." Convention, art. 3. As just noted, the child's habitual residence was Mexico. The custody agreement was entered by the Mexican family court in March 2010, and it required Salas-Perez to return the child to Mexico in August 2011 so the child could resume school there. Estrada's custody rights under Mexican law are beyond any reasonable dispute.

Salas-Perez argues that the custody agreement had no legal effect under Mexican law because it was the product of coercion. In so arguing, Salas-Perez effectively asks this court to overturn the Mexican court's ruling that the custody agreement complies with Mexican law—the order expressly provides that the "since [the custody] agreement does not contain clauses contrary to the law, moral and good habits, [it] is approved and is condemned to the signors," which included not only the Mexican judge, but also a representative from the Mexican Ministry of Foreign Affairs. Pet. Exh. 4. This court cannot and will not overturn the Mexican court's conclusion—which was ratified by the Mexican Ministry of Foreign Affairs, whose representative co-signed the order—that the custody agreement is valid under Mexican law. The Mexican court is the appropriate venue for Salas-Perez to press any argument that the agreement is invalid under Mexican law due to its allegedly being procured by coercion. *See Currier v.*

*Currier*, 845 F. Supp. 916, 921 (D.N.H. 1994) ("The German courts are fully empowered to grant appropriate relief upon a showing of fraud, and it would be inappropriate for this court to presume to second-guess the determination made by those courts on the merits, or to usurp the jurisdiction of those tribunals to address the matter of fraud in the procurement of orders from those courts. Any such review would be entirely outside the scope of inquiry permitted under the Convention.").

Salas-Perez also argues that Article 16 prohibited the Mexican court from deciding "the merits of rights of custody" while her Hague Convention petition was pending. Convention, art. 16 ("After receiving notice of a wrongful removal or retention of a child in the sense of Article 3, the judicial or administrative authorities of the Contracting State to which the child has been removed or in which it has been retained shall not decide on the merits of rights of custody until it has been determined that the child is not to be returned under this Convention or unless an application under this Convention is not lodged within a reasonable time following receipt of the notice."). The argument fails. The Mexican court that entered the March 2010 order was the very court before which Salas-Perez's Hague Convention petition was proceeding, and Salas-Perez expressly agreed to the entry of that order. Salas-Perez's submission that the Mexican court could not approve a custody agreement that she herself reached with Estrada cannot be reconciled with Article 13(a), which excuses an otherwise wrongful removal or retention if "the person … having the care of the … child … had consented to or subsequently acquiesced in the removal or retention." Convention, art. 13(a). "[I]t is hard to think of a more formal acquiescence than entering into a *consent order* providing that the other parent be awarded custody." *Nicolson v. Pappalardo*, 605 F.3d 100, 106 (1st Cir. 2010).

As to the fourth factor, the court holds that Salas-Perez's retention of the child in Illinois breached Estrada's custody rights under the March 2010 custody order. By failing to send the child back to Mexico in August 2011, Salas-Perez deprived Estrada of his right to custody of the child during the school year.

As to the fifth factor, Estrada exercised and sought to exercise his rights of custody as of the time of retention. Between March 2010, when the Mexican family court entered the custody order, and August 2011, when Salas-Perez violated that order, the child lived with Estrada in Mexico. The child's temporary visits to Chicago did not disrupt Estrada's custody rights; to the contrary, the trips were mandated by the custody agreement, and Salas-Perez returned the child to Mexico after the first four visits. After Salas-Perez's retention of the child in August 2011, Estrada attempted to exercise his custody rights by seeking to persuade Salas-Perez to return the child and by pursuing his rights under the Convention.

For these reasons, Estrada has proved by a preponderance of the evidence that Salas-Perez's retention of the child in Illinois was wrongful under Article 3 of the Convention. *See Kijowska*, 463 F.3d at 588; *Feder v. Evans-Feder*, 63 F.3d 217, 222-26 (3d Cir. 1995).

## B.    Grave Risk

"Article 13(b) of the Convention and 42 U.S.C. § 11603(e)(2)(A) provide that when a respondent demonstrates by clear and convincing evidence that there is a grave risk that the child's return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation, the automatic return required by the Convention should not go forward." *Norinder*, 657 F.3d at 534; *see also Van De Sande v. Van De Sande*, 431 F.3d 567, 569 (7th Cir. 2005). The Seventh Circuit has emphasized that the risk must "truly be grave" to justify declining to return the child to her habitual residence, and has cautioned that "[c]oncern

with comity among nations argues for a narrow interpretation of the 'grave risk of harm'

defense; but the safety of children is paramount." *Norinder*, 657 F.3d at 535. The State

Department likewise has cautioned that "the person opposing the child's return must show that

the risk to the child is grave, not merely serious," and has stressed that Article 13(b) "was not

intended to be used by defendants as a vehicle to litigate (or relitigate) the child's best interests."

Hague International Child Abduction Convention; Text and Legal Analysis, 51 Fed. Reg.

10494; *see Blondin v. Dubois*, 238 F.3d 153, 162 n.10 (2d Cir. 2001) (according "great weight"

to the State Department's interpretation of the Convention). The First Circuit is in accord:

> [T]he harm must be a great deal more than minimal. Not any harm will do
> nor may the level of risk of harm be low. The risk must be "grave," and
> when determining whether a grave risk of harm exists, courts must be
> attentive to the purposes of the Convention. For example, the harm must be
> something greater than would normally be expected on taking a child away
> from one parent and passing him to another; otherwise, the goals of the
> Convention could be easily circumvented.

*Walsh v. Walsh*, 221 F.3d 204, 218 (1st Cir. 2000) (citations omitted).

Salas-Perez has not proved grave risk by clear and convincing evidence. The evidence

shows that there were a handful of physical episodes during the two years that Janet lived with

Estrada and the child. While both Lara and Dr. Machabanski opined that physical discipline is

unacceptable, the court agrees with Dr. Machabanski that the "rare and unusual" physical

episodes—which in addition to being rare and unusual were not terribly severe when compared

by the episodes described in reported Hague Convention cases—do not create a serious risk of

physical or psychological harm, let alone a grave risk of such harm. *Compare Baran v. Beaty*,

526 F.3d 1340, 1352 (11th Cir. 2008) ("There is abundant, credible evidence before the Court

that Baran is a violent and abusive man with a lengthy history of inflicting physical and

psychological abuse on those he ostensibly loves the most. His volatile personality, his

propensity for alcohol abuse and his frequent statements of thinly veiled hatred for Sam and Sam's mother prior to Sam's removal combine to produce a highly combustible powder keg from which this Court is powerless to protect Sam. For this Court blithely to ship Sam back to Australia subject to elaborately crafted, well-meaning conditions that may or may not be enforced or enforceable by an Australian court would be to abdicate its overarching responsibility to protect this child from harm, while simultaneously entangling this Court in custody matters that exceed its authority and jurisdiction. This the Court will not do.") (adopting the district court's findings); *Van de Sande*, 431 F.3d at 569 (holding that grave risk would be present if it were found that the father beat the mother in front of the children, struck the daughter with a sharp blow to the side of the head, called the mother a "cunt," "whore," "lazy fucking bitch," and "lazy fat bitch" in front of the children, and threatened to kill the children); *Di Giuseppe v. Di Giuseppe*, 2008 WL 1743079, at *6 (E.D. Mich. Apr. 11, 2008) (finding a grave risk where the petitioner used corporal punishment three times a month, including slapping the child hard enough to leave marks, slamming the child's head into a cupboard, which drew blood, and biting the child in front of school officials), *with Altamiranda Vale*, 538 F.3d at 587 (holding that grave risk was not shown where the father "struck his son with a video-game cord"); *Lopez v. Alcala*, 547 F. Supp. 2d 1255, 1261-62 (M.D. Fla. 2008) ("Even if this Court took all of the children's testimony as true, it does not rise to the level of an intolerable situation. Sinai indicated that his father hit him twice, and that he never saw his father hit Suri. Suri told Dr. Day that her father had hit her once or twice as well. This evidence only indicates that Lopez has used corporal punishment to discipline the children in the past. However, the possibility of such punishment being inflicted immediately upon the children's return is uncertain. Furthermore, there is no objective evidence of serious abuse by Lopez. Ultimately,

the alleged abuse in this case is not so severe that it rises to the level of an intolerable situation. Thus, this Court must order that the children be returned to Mexico, where custody will be determined by the Mexican courts.").

The evidence also shows that the child was required to eat blended-up food on at least one occasion and perhaps others. That may seem unusual, but it must be remembered that Estrada and Janet took this step on a physician's advice after the child experienced trouble with swallowing. If Estrada and Janet had not followed that advice, they might have been deemed grossly inattentive for allowing the child to be insufficiently nourished *despite* having received medical advice on how to address the child's swallowing problems. *See Friedrich v. Thompson*, 1999 WL 33954819, at *6 (M.D.N.C. Nov. 26, 1999) (considering whether the petitioner "failed to secure medical treatment for the child's illnesses" in determining whether returning the child to the petitioner would pose a grave risk of harm). Estrada and Janet were in a tough spot, and their decision to follow the physician's advice cannot be deemed to have placed the child at a grave risk of physical or psychological harm.

In sum, given the facts found above, Salas-Perez has not met the "demanding standard" of proof required to satisfy a grave risk defense under Article 13(b). *Norinder*, 657 F.3d at 535.

### Conclusion

Estrada has proved by a preponderance of the evidence that Salas-Perez's retention of the child in Illinois was wrongful within the meaning of Article 3 of the Convention. Salas-Perez has failed to prove by clear and convincing that the child's return to Mexico would place her at a grave risk of psychological or physical harm within the meaning of Article 13(b) of the Convention. Estrada's petition therefore is granted. The child shall be returned to Mexico as soon as practicable. This order does not speak, one way or the other, to Salas-Perez's fitness as a

custodial parent.  Nor does it speak in any way to whether the March 2010 custody arrangement ought to be modified for any of the reasons articulated by Salas-Perez in this Hague Convention proceeding.  If Salas-Perez believes that modification of the custody agreement is warranted, she should seek relief in the courts of Mexico.  *See Abbott v. Abbott*, 130 S. Ct. 1983, 1989 (2010) ("A return remedy … leaves custodial decisions to the courts of the country of habitual residence.").

The court expresses its deep appreciation for the professionalism and excellence of counsel for both sides: Richard Winter and Maureen Browne of Holland & Knight, who represented Estrada, and Phillip Brigham of The Law Offices of Phillip Brigham, LLC, and Salvador Cicero of The Cicero Law Firm, P.C., who represented Salas-Perez.  Counsel provided their services without charge, and their clients could not have been more ably represented.

September 28, 2012                                             _____
                                                                        United States District Judge